**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SHUYING WANG,

Plaintiff,

v.

Regents of the UNIVERSITY OF MICHIGAN, ANNA SCHWENDEMAN, and STEVEN SCHWENDEMAN,

Defendants.

Case No. _____________

Hon. _________________

**NOTICE OF REMOVAL**

---

Nicholas Roumel (P37056)
ROUMEL LAW
*Attorney for Plaintiff*
4101 Thornoaks Dr.
Ann Arbor, MI 48104
(734) 645-7507
nick@roumel-law.com

Brian M. Schwartz (P69018)
Gabrielle M. A. Bayne (P88706)
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
*Attorneys for Defendant Regents of the University of Michigan*
150 W. Jefferson, Ste. 2500
Detroit, MI 48226
(313) 963-6420
schwartzb@millercanfield.com
bayne@millercafield.com

Angela L. Jackson (P53930)
HOOPER HATHAWAY, P.C.
*Attorney for Defendant Anna Schwendeman*
126 S. Main Street
Ann Arbor MI, 48104
(734) 662-4426
ajackson@hooperhathaway.com

Daniel B. Tukel (P34978)
BUTZEL LONG P.C.
*Attorney for Defendant Steven Schwendeman*
201 W. Big Beaver Rd., Ste. 1200
Troy, MI 48084
(248) 258-1616
tukel@butzel.com

---

# NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1331, 1332, 1441, and 1446, Defendant Regents of the University of Michigan ("University"), by and through its attorneys, hereby gives Notice of Removal of this action from Washtenaw County Circuit Court to the United States District Court for the Eastern District of Michigan. In support of this Notice, the University states:

1. On September 14, 2026, Plaintiff Shuying Wang ("Wang") commenced a lawsuit in Washtenaw County Circuit Court, bearing Case No. 26-001888-CZ against the Regents of the University of Michigan, Anna Schwendeman, and Steven Schwendeman (the "State Court Action").

2. On October 1, 2026, the University accepted service of the Summons and Complaint, with the parties agreeing that the University would have until November 30, 2026 to respond to the Complaint.

3. A copy of all process, pleadings, and orders served upon the University is attached hereto. (Exhibit A, Summons and Complaint.)

4. The Complaint asserts eight claims, including both federal and state law claims. The federal claims include claims under 42 U.S.C. § 1983 and 18 U.S.C. §§ 1589 and 1595. The state law claims include Intentional Interference with Business Expectancy and violations of the Elliott-Larsen Civil Rights Act.

## JURISDICTION – GROUNDS FOR REMOVAL – FEDERAL QUESTION

5. Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over claims arising under federal law without respect to the amount in controversy or the citizenship of the parties. This action is also one that may be removed pursuant to 28 U.S.C. § 1441(a) as a civil action of which district courts have original jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction).

6. The plain language of the Complaint asserts claims under "42 U.S.C. §§ 1983 – Violation of the Equal Protection Clause," "42 U.S.C. §§ 1983 – Deprivation of Procedural Due Process," and "18 U.S.C. §§ 1589 and 1595 – Trafficking Victims Protection Reauthorization Act." (Ex. A, Compl. at pp. 32-37). Thus, federal-question jurisdiction is apparent on the face of the Complaint. *See, e.g.*, *Majeske v. Bay City Bd. of Ed.*, 177 F. Supp. 2d 666, 670 (E.D. Mich. 2001) ("Under the 'well-pleaded complaint' rule, federal jurisdiction is determined by the allegations on the face of the plaintiff's properly pleaded complaint."); *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).

7. This Court has supplemental jurisdiction over the remaining state-law claims (Counts I-V) under 28 U.S.C. § 1367(a) because those claims arise from the same case or controversy as the federal claims pleaded in Counts VI-VIII.

## JURISDICTION – GROUNDS FOR REMOVAL – DIVERSITY OF CITIZENSHIP

8. This action is also one that may be removed pursuant to 28 U.S.C. § 1441(b) as a civil action of which district courts have original jurisdiction under 28 U.S.C. § 1332 (diversity jurisdiction).

9. Wang is a resident of Brewster, Putnam County, New York, and a citizen of the People's Republic of China. (See Ex. A, Compl., ¶¶ 1, 8).

10. Defendant Regents of the University of Michigan is an arm of the State of Michigan. Defendants Anna Schwendeman and Steven Schwendeman are residents and citizens of the State of Michigan.

11. Therefore, complete diversity of citizenship exists between Wang and the Defendants. 28 U.S.C. § 1332(a).

12. Pursuant to L.R. 81.1, the University submits that the amount in controversy exceeds the required jurisdictional amount. Wang alleges she was discriminated against based on her national origin in violation of Michigan's Elliott-Larsen Civil Rights Act. Wang also asserts additional claims for deprivation of procedural due process, violation of the Equal Protection Clause, intentional interference with business expectancy, and a claim under the Trafficking Victims Protection Reauthorization Act.

13. Even focusing solely on Wang's claims under the Elliott-Larsen Civil Rights Act, if she prevails, she may be able to recover monetary damages and

attorneys' fees. *See, e.g., Lilley v. BTM Corp.,* 958 F.2d 746, 754-56 (6th Cir. 1992). A defendant is permitted to demonstrate, through a fair reading of the complaint, that the unspecified damages sought will exceed $75,000 if proven. *Heyman v. Lincoln Nat'l Life Ins. Co.*, 781 F. App'x 463, 471 (6th Cir. 2019). Wang has not asserted a specific dollar value for all monetary relief sought in the Complaint. She does, however, allege "economic damages, non-economic damages, consequential damages, statutory damages, attorney fees where authorized by law" and that she has suffered "emotional distress, anxiety, humiliation, frustration, embarrassment, loss of professional standing, and mental anguish[.]" (Exhibit A, Compl., ¶¶ 259-61). She specifically alleges entitlement to:

a. Compensatory damages (*Id.* at "Prayer for Relief," ¶ 1.a.);

b. Punitive damages (*Id.* at "Prayer for Relief," ¶ 1.b.);

c. Liquidated damages (*Id.* at "Prayer for Relief," ¶ 1.c.);

d. Compensable costs, interests, and reasonable attorney fees (*Id.* at "Prayer for Relief," ¶ 1.e [sic].).

The University, of course, denies that Wang is entitled to any of the relief sought in the Complaint. Nonetheless, the Complaint as it stands at the time of removal clearly contains requests for relief exceeding the jurisdictional amount.

14. Wang alleges that she received a post-graduation employment offer that included a total compensation package of approximately $210,500, relocation to

California, and H-1B sponsorship, with a planned start date of August 18, 2025. (Ex. A, Compl., ¶¶ 28, 30). She further alleges that certain conduct delayed her anticipated graduation date and caused rescission of that post-graduation offer because of "timing issues." (Id. ¶¶ 120-21). According to the Complaint, Wang did not obtain full-time employment until May 11, 2026, and, in the interim, endured "months of additional financial, professional, and immigration-related uncertainty." (Id.). By Wang's own allegations, approximately nine months elapsed between her expected start date and the date she secured subsequent employment. Based solely on the alleged $210,500 annual compensation package, that nine-month period represents approximately $157,875 in alleged lost earnings, therefore satisfying the $75,000 amount-in-controversy requirement.

15. Attorneys' fees are also available under the Elliott-Larsen Civil Rights Act. MCL 37.2802. Wang's demand for "reasonable attorney fees" (Ex. A, Compl., "Prayer for Relief," ¶ 1.e), in conjunction with her economic and non-economic damages, also establishes that the amount in controversy threshold set forth in 28 U.S.C. § 1332 has been met. *See Hollon v. Consumer Plumbing Recovery Ctr.*, 417 F. Supp. 2d 849, 853 (E.D. Ky. 2006) (estimating statutory attorney's fees at a rate of thirty percent for purposes of determining amount in controversy).

16. Based on the type of relief sought by Wang, the amount in controversy exceeds the threshold necessary for removal.

***

17. This action is one which may be removed pursuant to 28 U.S.C. § 1441 as a civil action of which the district courts have original jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1332 (diversity jurisdiction).

18. The United States District Court for the Eastern District of Michigan is the federal district court having jurisdiction over the place where the State Court Action is pending.

19. Pursuant to 28 U.S.C. § 1446(b)(1), this Notice is timely, having been filed with this Court within thirty (30) days after receipt by Regents of the University of Michigan of the initial pleading from which it may be first ascertained that the case is one which is removable.

20. Pursuant to 28 U.S.C. § 1446(b)(2)(A), all properly joined and served defendants must consent to removal. Regardless of whether they have been properly served, Anna Schwendeman and Steven Schwendeman consent to removal.

21. A true and correct copy of this Notice of Removal has been sent to the Clerk of the Washtenaw County Circuit Court for filing as provided by law.

22. Written notice of this Notice of Removal will be given to the adverse parties as required by law.

23. No other process, pleadings, or orders served by or upon Regents of the University of Michigan in this action.

WHEREFORE, based on the foregoing, the Regents of the University of Michigan give Notice of Removal of the State Court Action to the United States District Court for the Eastern District of Michigan, Southern Division, and requests all future proceedings be held in this Court.

Dated: October 29, 2026

Respectfully submitted,

*/s/ Brian M. Schwartz*

Brian M. Schwartz (P69018)
Gabrielle M. A. Bayne (P88706)
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
*Attorneys for Defendant Regents of the University of Michigan*
150 W. Jefferson, Ste. 2500
Detroit, MI 48226
(313) 963-6420
schwartzb@millercanfield.com
bayne@millercanfield.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2026, I caused to be filed the foregoing document with the Clerk of the court via the Court's ECF/CM filing system which will send notice to all counsel of record via email.

*/s/ Brian M. Schwartz*
Brian M. Schwartz (P69018)

# *Exhibit A*

**STATE OF MICHIGAN**
**WASHTENAW COUNTY CIRCUIT COURT**

SHUYING WANG,

Plaintiff,
v.

Regents of the
UNIVERSITY OF MICHIGAN,
ANNA SCHWENDEMAN, and
STEVEN SCHWENDEMAN,

Defendants.

26-001888-CZ
Case No: 26 - _______ - CZ

Honorable: JUDGE JULIA B. OWDZIEJ

---

Nicholas Roumel (P37056)
**ROUMEL LAW**
4101 Thornoaks Dr.
Ann Arbor MI 48104
734-645-7507
*nick@roumel-law.com*

---

# COMPLAINT

Plaintiff makes her complaint as follows:

## PARTIES, JURISDICTION, AND VENUE

1. At all relevant times, Plaintiff Shuying Wang ("Shuying") was a resident of Ann Arbor, Washtenaw County, Michigan. Shuying is currently a resident of Brewster, Putnam County, New York.

2. Defendant University of Michigan was at all relevant times, and continues to be, a State of Michigan public educational institution in Washtenaw



FILED IN Washtenaw County Trial Court; 9/14/2026 12:05 PM

County, Michigan, organized and existing under the laws of the State of Michigan. The Regents are their governing body. Collectively, they are referred to as "UM."

3. At all relevant times, Defendants Anna Schwendeman ("Defendant Anna") and Steven Schwendeman ("Defendant Steven"), (collectively, the Defendants Schwendeman), were agents and/or employees of the University of Michigan, and are sued in their official and/or individual capacities, as set forth with more specificity below. They were a married couple at all times relevant.

4. At all relevant times, Plaintiff Shuying was a doctoral student in the College of Pharmaceutical Sciences at the University of Michigan. She also conducted her doctoral research as a paid employee in the laboratory of Dr. Steven Schwendeman, who at all relevant times also served as her dissertation committee chair, her faculty advisor, and her principal investigator ("PI").

5. At all relevant times, Dr. Anna Schwendeman was a department chair at the Department of Pharmaceutical Sciences. Anna also served on Shuying's dissertation committee.

## FACTUAL ALLEGATIONS

*Shuying's Contributions to the Schwendemans' Laboratory & Private Company*

6. Shuying enrolled in the University of Michigan's Ph.D. program in Pharmaceutical Sciences in September of 2020.

7. Shuying began working in Steven's lab in Summer 2021. By 2025, Shuying was a doctoral candidate in good standing who had spent approximately five years pursuing her Ph.D.

8. Shuying is a citizen of the People's Republic of China and, at all relevant times, was lawfully present in the United States pursuant to an F-1 student visa.

9. During Shuying's tenure in Steven's laboratory, Anna and Steven were in the process of establishing a private biotechnology company known as ASKO.

10. Upon information and belief, ASKO was created to commercialize technology arising from research conducted in Steven's laboratory.

11. Shuying was the primary contributor of the National Institute of Health (NIH) Small Business Innovation Research (SBIR) grant used to fund ASKO.

12. Shuying produced over 60% of the preliminary data used in the application for the SBIR grant used to fund ASKO.

13. Shuying was asked to interview candidates for positions with ASKO because Steven and Anna considered her to be one of the laboratory's subject-matter experts.

14. Shuying's research led to Steven filing a 2023 patent entitled, "pH-Controlled Biodegradable Polymeric Particles for Sustained Release of Positively Charged Species."

15. In a testimonial dated December 3, 2024, Steven described Shuying's successful grant and patent applications as evidence of her "exceptional qualifications as a researcher" and her "ability to produce outcomes of both scientific and commercial significance."

16. According to "KO," a Research Laboratory Specialist who worked in Steven's laboratory for approximately sixteen years, Steven stated during a meeting in March 2025 that he wished other students were more like Shuying because he was very pleased with her work. KO recalled Steven describing Shuying's work as "very, very good, even amongst her peers."

17. On May 14, 2025, "KF," Senior Associate Dean of the College of Pharmacy, stated in an email that she, Anna, and Steven regarded Shuying as "a significant scientist with great talent."

*Shuying's Academic Progress & Gilead Job Offer*

18. Shuying was on track to graduate with a Ph.D. in August of 2025.

19. In October of 2024, Shuying met with her four-member dissertation committee (which included Steven and Anna), where she proposed a timeline with an August 2025 graduation.

20. No one on her dissertation committee objected to her proposed timeline.

21. The Pharmaceutical Sciences Graduate Program Handbook ("the Handbook") required a student to have (a) one first-author paper published and (b) one paper submitted prior to graduating.

22. The Handbook stated that "in unusual circumstances (because of patent applications or slow responses from Ph.D. advisor, etc.) the publication requirement can be waived at the discretion of the Ph.D. dissertation committee in consultation with the department office."

23. Consistent with these requirements, Shuying had already completed a first-author publication in 2023 that was accepted by the *Journal of Controlled Release*.

24. On April 23, 2025, Shuying submitted a draft of her second manuscript to Steven in expectation that it would be ready for submission by her August 2025 graduation.

25. On or about March 28, 2025, Gilead Sciences, Inc., a major American biopharmaceutical company, recruited Shuying for a position in the division of Drug Delivery Innovation & Strategy.

26. Shuying interviewed for the position on April 1, 2025, with division director Dr. Tyler Novak ("Novak").

27. On April 30, 2025, Shuying secured a job offer from Gilead.

28. The job offer came with a compensation package worth $210,500, a relocation to California, and—critically—an H1-B sponsorship.

29. For Shuying, the H-1B sponsorship was particularly valuable because, as a Chinese national present in the United States on an F-1 student visa, her ability to remain and work in the United States depended upon securing employment authorization after graduation. The Gilead position provided a direct transition from graduate school to private-sector employment and positioned Shuying to participate in the next H-1B visa lottery in March 2026.

30. Gilead required her to start in June of 2025; however, Shuying negotiated with Gilead to push the start date back to August 18, 2025.

31. On information and belief, Shuying was well within the typical three-month to six-month window after completing her final data session when it was common for students to start looking for employment.

*Defendants Delay Shuying's Graduation*

32. On Wednesday, April 30, 2025, Shuying informed Steven about her Gilead job offer.

33. Steven told Shuying he had a dinner meeting, but he suggested they meet on Friday to go through her final thesis chapters together.

34. On Friday, May 2, 2025, Shuying emailed Steven an outline of her final thesis chapters and asked him what time they should meet. Steven responded that Friday no longer worked and that they would talk on Monday.

35. On Monday, May 5, 2025, Anna asked Shuying to meet in her office. Anna told Shuying that Steven sent her to speak with Shuying on his behalf so he could "avoid conflict."

36. Anna informed Shuying that Steven was upset because Shuying had searched for a job without first obtaining Steven's permission.

37. Anna reported that Steven had said that Shuying was "equal to three laborers in the lab," and that Steven wanted to keep her in the laboratory "as long as possible…forever if he could."

38. Anna confided that this situation was Steven's fault because he didn't meet with his people enough. If he had met with Shuying more than once a month, then he would have known she was looking for a job.

39. Anna proposed they create a plan to present to Steven, and she suggested a September or October graduation date.

40. Anna suggested contacting Novak to ask him to push back the start date until mid-October.

41. Anna explained this was necessary due to "concerns about tuition"—graduating in August would cause Steven to pay summer tuition. She did not identify any other reasons, such as performance-based concerns.

42. Shuying had learned from "CD," a non-international (domestic) lab member who had recently graduated, that CD had needed to involve her hiring manager to obtain a concrete timeline from Steven.

43. Based on CD's experience, and not understanding Anna's explanation about "concerns about tuition," Shuying contacted Novak on Tuesday, May 6, 2025to see if he could push the start date back to mid-October. Novak said he could not because the business is quarter based, so October would be too late.

44. Novak offered to speak to Steven to get a concrete timeline.

45. On Wednesday, May 7, 2025, Shuying met with Steven in his office. She told him she did not know they had to communicate through his wife, Anna.

46. Steven told Shuying that he was frustrated about other students leaving the lab without his approval.

47. He stated that several had not been qualified to get a Ph.D., but Shuying was not one of them.

48. He then said that Shuying had done "the best I can imagine" with her project.

49. Shuying mentioned how competitive the job market was, and that she did not want to lose this position. She expressed her desire to go to big pharma so she could deliver a product directly to the patient.

50. Steven then said that she should not worry about the job market. He was very confident that she would find another job, as she was very impressive.

51. He concluded by stating that he had reservations about big pharma and encouraged Shuying to join ASKO or stay in academia.

52. Following this meeting, Shuying sent an email introducing Novak and Steven and requesting that they discuss a timeline. Novak responded with his availability.

53. According to Lab Specialist "KO," Steven had recently obtained funding through ASKO-related projects and had not recruited significant numbers of new graduate students into the laboratory. KO stated that many of the laboratory's key scientific personnel were senior doctoral students awaiting graduation and that student departures had become a significant concern within the laboratory.

54. KO further stated that, based upon his observations, several students appeared to be retained in the laboratory longer than necessary and that he was unaware of any academic reason requiring certain students to remain as long as they did.

55. On Thursday, May 8, 2025, Shuying texted Anna asking for help. Shuying expressed fear that if she pushed Gilead any harder to delay the start date that she would lose her job offer.

56. Anna responded that she would talk to Steven.

57. On Friday, May 9, 2025, Steven spoke with Novak.

58. Afterwards, Novak texted Shuying to report that "It was a positive conversation. The ball is in his court, and I've set a timeline for when I need to know."

59. On Saturday, May 10, 2025, at 9:04 a.m., Anna texted Shuying stating, "the more [I] learn about Gilead job and your manager - the more I think it is a stupid job and you should look for another position. Your boss is an overconfident moron."

60. An hour later, Anna followed up asking, "what is your green card status? If you don't have it yet and Gilead fires a postdoc in 1 year - what are you going to do? This is my #1 concern. GO TO MEECK [sic]!"

61. Upon information and belief, Anna's reference to Merck was based on a job announcement circulated through a department-wide email listserv on Monday, May 5, 2025. Shuying had not been recruited by Merck, had not spoken with anyone at Merck, and had no pending employment opportunity at Merck.

62. On the afternoon of Saturday, May 10, 2025, Anna asked Shuying to either come over to her house or to meet via Zoom. Shuying agreed, but Anna never followed up.

63. At around 8:00 p.m. on Saturday, Steven emailed Shuying stating that she would defend her dissertation at the end of the "winter term," which Shuying understood to refer to the Winter, 2026 term (January-April 2026), thereby delaying her graduation beyond December, 2025.

64. Steven later told VE, the Dean of the College of Pharmacy, that he had intended a December, 2025 target graduation date for Shuying.

65. In any event, Steven's email confessed: "I am sure this predicted schedule will not be suitable for Tyler [Novak] and I am sorry about it. You should have asked me before looking for a job. This does not respect our lab and department structure. If all the students did that we would have a very unpleasant department indeed."

66. Steven's email did not identify any specific deficiency in Shuying's research or publication requirements that would require such an extension.

67. Steven's email was also inconsistent with his practice towards non-international (domestic) students such as "CD," who did not have to seek Steven's permission to search or apply for jobs; rather, for such students, obtaining a job offer initiated a dissertation defense date compatible with the job offer.

68. Steven's new timeline extended Shuying's anticipated graduation date by approximately four months beyond her planned August 2025 graduation, and two months beyond Anna's proposed October 2025 graduation.

69. Prior to Shuying's acceptance of the Gilead offer, neither Steven, Anna, nor any other member of Shuying's dissertation committee had informed her she would be required to remain enrolled beyond August 2025.

70. At 8: 25 p.m. on Saturday, May 10, 2025, Shuying responded to Steven's email expressing her respect for him as a scientist and pleading with him to identify the scientific basis for delaying her graduation.

71. At 8:50 p.m., Shuying texted Anna and asked her if she had seen Steven's email.

72. Anna responded, "Yep, he sent the email and I uphold the decision as a committee member and chair."

73. Anna then texted, "…Only thing I could do is talk to Mr. Arrogant Novak. (He is a Jew, I know the type)."

74. Anna continued, "He can hold the position if he really wants you. But, I do think he is slightly stupid and for sure stupider than you…"

75. Anna then concluded: "Get your green card at UMichigan…Apply for Merck job I sent around."

76. In a later interview with the University Office of Equity, Civil Rights and Title IV, Anna stated that when she upheld Steven's decision, she did not have all the information about Shuying's publications or research.

77. On Sunday, May 11, 2025, at 12:41 p.m., Steven responded to Shuying's email. The tone was cordial, however Steven still did not identify any unmet graduation requirement, academic deficiency, failed experiment, publication deficiency, or other objective criterion that would prevent Shuying from graduating.

78. Instead, Steven referenced future work, potential publications, and his personal assessment of the project. He wrote, for example, "…as you clearly wish to become a strong scientist - and you are in my opinion in the throes of completing the most important paper in your career - is that something you think should be rushed?"

79. Later that evening, Shuying texted Anna that she wanted to meet with the committee to agree on a timeline and what requirements she was lacking so that there was not similar confusion in the future.

80. Anna responded, "Shuying, Maybe I talk to you in person when I am back [from Taiwan]."

*Shuying's Psychiatric Emergency & Defendants' Response*

81. That evening, Sunday, May 11, 2025, Shuying experienced a psychiatric emergency requiring a two-day hospitalization.

82. During this period, Anna communicated via text with Shuying's boyfriend, Joel Guo.

83. Anna advised Guo to show Shuying's text exchange with Anna to her doctor because, "I am not a physiatrist [sic] - but when I read these messages - I think 'bipolar disorder'."

84. Anna then explained to Guo the power dynamics in the lab, stating, "Steve and I are so angry… she has to understand we can dismiss her from the graduate program tomorrow…I am not sure how to explain to her the fundamental power dynamics…She will be done when Steve tells her she is done."

85. Anna stated, "This is a really stupid situation. Shuying is talented and capable … but she needs to 'stand down' and actually apologize…"

86. Anna then alluded the lab's financial issues when she stated that, "we have 2 meetings per day in Taiwan trying to…find money to pay people under [NIH] grant reductions…"

87. Anna concluded by suggesting to Guo that Shuying contact her parents and take academic leave in China for a semester or year to "take care of her health."

88. Guo understood Anna's messages to mean that if Shuying did not apologize to Steven, he would fire her from the lab. He asked Anna for clarification. In response, Anna suggested they have a video call right then.

89. Anna contacted Guo from Taiwan at approximately 1:00 p.m. EST (1:00 a.m. in Taiwan) via FaceTime.

90. During the video call Gou witnessed Anna drinking what appeared to be an alcoholic beverage in a hotel lobby. Guo offered to meet at another time, but Anna said she wanted to talk then.

91. Guo asked Anna what else Shuying needed to do to graduate since she had already fulfilled the requirements in the handbook.

92. Anna said she did not care about the handbook.

93. Anna stated that Shuying's project was "easier" than other students', so she needed to do more. She should publish ten papers if she is really working hard.

94. Guo asked Anna to clarify whether Shuying needed to publish ten papers to graduate.

95. Anna did not answer.

96. Guo then asked Anna whether Steven was going to dismiss Shuying from the lab if she did not apologize.

97. Anna replied, "Life is unfair. This is how power works. I have the power, so I decide. I can be the final decision maker. I say whatever things and you guys need to follow because I'm the chair."

98. Anna said she and Steven have "many different weapons" to deal with students like Shuying—dismissing them is just one. As department chair, she could cut Shuying's funding.

99. Anna asked Guo if he knew what happened to students like Shuying in the workplace. She then made a cut-throat gesture by swiping hand across her throat.

100. Anna then threatened to send Shuying back to China if she did not "stand down."

101. She said that Steven liked Shuying, so she is still in the lab, but "his mind can change at any time now."

102. Anna concluded their conversation by saying that managing students in a lab is like running a company. She stated that if she has ten monkeys working for her, and fires one, the rest of the nine will work harder for her.

103. The substance of Anna's monkey statement was later corroborated by KO, veteran lab specialist, who reported that he had previously heard Anna make similar statements regarding the management of laboratory personnel.

104. Anna never told Guo what else Shuying needed to do to graduate.

105. Later, while Shuying was still in the hospital, Anna told "LM," a Chinese research investigator in Anna's lab, to contact Guo.

106. LM told Guo that Anna has a good heart but sometimes gets worked up and says the wrong thing.

107. LM shared with Guo that Steven was a "good guy," but he was having a "hard time because his lab was understaffed and he was frustrated."

108. LM urged Shuying to "stay in the Schwendeman lab after graduation and noted that Shuying could eventually get a green card if she continued to work in the lab."

109. Following this call, Shuying's hospital social worker encouraged Shuying to reach out to the University to alert them to the reason for her absence.

110. On Wednesday, May 14, 2025, at 6:33 p.m., KF, Senior Associate Dean of the College of Pharmacy, followed up with Shuying.

111. KF had seen Anna's concerning text messages to Guo.

112. She wrote to assure Shuying that the Schwendemans could not follow through with their threats to dismiss her or cut her funding.

113. KF noted that Shuying's Individual Development Plan (IDP) demonstrated that her performance was "stellar."

114. KF stated that the IDP combined with the other documentation "really seem to support that you have met [the graduation] requirements."

115. KF told Shuying that "VE," Dean of the College of Pharmacy, would work with Steven to "resolve this situation" the following week.

116. On Monday, May 19, 2025, Dean VE emailed Novak of Gilead to assuage his worries about Shuying's candidacy. She stated, "I spoke with Steve over

the weekend and he has been working with Shuying to identify a timeline for her defense. It is looking like they are planning on that to be by August 30th…. I'm sorry this became such a mess and does not stop you for considering Shuying…".

117. On Monday, May 19, 2025, Novak responded to Dean VE to communicate the "interesting" experience of the Schwendemans' influence in Shuying's candidacy for employment.

118. Novak noted that standard procedure is direct communication with the candidate, however, "This is the first time in my years of hiring that I have had a PI [Steven] insist on speaking with me…. As well as Anna then making contacts and phone calls to other leadership at the company to try to influence the outcome."

119. He then expressed concern that the Schwendemans may continue to change Shuying's graduation date: "Shuying is an excellent candidate for the role…I am concerned that as we approach August, the goalposts will then continue to shift."

120. Despite the intervention of Dean VE and Dean KF, Steven declined to permit Shuying to graduate any earlier than August 30, 2025.

121. On Friday, May 23, 2025, Gilead's Human Resources Department informed Shuying that Gilead was rescinding its employment offer due to "timing issues."

122. Soon thereafter, Shuying contacted Novak to explain all that had happened "behind the scenes" in the weeks leading up to Gilead rescinding the offer.

123. On Saturday May 24, 2025, Novak called Shuying to tell her that he had met with Gilead Vice President, Dr. Justin Wright, and informed him about what had transpired.

124. On Tuesday, May 27, 2025, Dr. Wright emailed Dean VE and Laurie McCauley, Provost and Executive Vice President for Academic Affairs, to alert them to "a matter of concern regarding our recent efforts to recruit…Shuying Wang." Wright wrote:

> While I understand the complexities involved in graduate education and career transitions, I feel compelled by ethical responsibility to bring these observations to your attention.… [B]eyond the concerns regarding the [antisemitic] remarks about Tyler, I have observed dynamics within the department that may also warrant review, particularly as they pertain to Shuying's situation.

*ERCT Investigation & Finding of Discrimination Based on National Origin*

125. On Saturday May 24, 2025, Shuying submitted a complaint against Anna to the Office of Equity, Civil Rights, and Title IX (ECRT).

126. In June 2025, ECRT issued a Mutual Contact Restriction between Shuying and Anna as they began the formal investigation process.

127. On September 18, 2025, ECRT issued its Final Investigation Report ("the Report"), which substantiated Shuying's complaint of discrimination based on national origin. The Report concluded that Shuying's national origin was a factor in the decision to delay her graduation until Fall 2025, and that the decision had an adverse impact on Shuying.

128. Accordingly, the Report found that Anna's conduct constituted discrimination based on national origin in violation of university policy.

129. In reaching that conclusion, the Report found substantial evidence that publication requirements were applied differently to domestic and international students. Specifically, the Report found that between 2022 and 2025, no international students were permitted to graduate without at least one first-author publication and one additional manuscript submitted, while at least eight domestic students graduated without any publications.

130. The Report identified an unmanaged conflict of interest: Anna was both department chair and committee member, and the wife of Shuying's advisor.

131. The Report concluded by noting: "Considering complainant Wang is an international student, and Dr. Schwendeman wanted to keep her in the lab, it is plausible that he delayed her graduation, a decision Anna upheld, knowing that Gilead would not hold the job offer, and Wang would be forced to stay in the lab until securing other employment."

*Defendants' Differential Treatment of International Students*

132. The laboratory included multiple international doctoral students whose ability to remain and work in the United States depended in substantial part upon their academic progress, graduation dates, and post-graduation employment opportunities.

133. As experienced faculty members and administrators, Anna and Steven knew or reasonably should have known that international students were uniquely dependent upon faculty decisions affecting degree completion, employment opportunities, immigration-related documentation, and post-graduation placement.

134. For example, multiple domestic doctoral students in Steven's laboratory graduated without satisfying the publication requirements imposed upon Shuying and other international students. Most notably, "CD" secured employment and was permitted to defend her dissertation in March 2025 despite not having published a first-author manuscript.

135. In contrast Anna and Steven subjected international students to practices and expectations that differed from those applied to domestic students.

136. Shuying and other international students were asked to assist with grant proposals and interviews for Anna and Steven's private company, ASKO, tasks that were not required of domestic students.

137. On information and belief, two other international doctoral students experienced graduation delays under Anna and Steven's supervision: "TZ," a sixth-year Ph.D. student with published research, and "AC," a fifth-year Ph.D. student with published research. In contrast, non-international domestic students were permitted to graduate without satisfying the graduation requirements stated in the student handbook.

138. Anna berated international students “JG” and “RD,” telling them that if they left the lab, they would not be able to work in any other laboratory at the University because she “knows everyone” and would have them fired.

139. KO, a Research Laboratory Specialist who worked in Steven’s laboratory for sixteen years, personally overheard Anna make the statements described in the preceding paragraph.

140. During a laboratory meeting, Anna told students that she regularly signed immigration paperwork that allowed individuals to remain in the United States.

141. After an Iranian doctoral student, NS, received a job offer from Eli Lilly, Anna and Steven communicated negative information about NS to the hiring manager. The hiring manager ultimately hired NS despite those communications, later stating that he knew Steven was unhappy when students and researchers left his laboratory.

142. Anna advised NS to marry the son of the Department Chair at the University of Utah because he was Iranian American and, according to Anna, NS could thereby obtain a green card and faculty position.

143. On or about May 5, 2025, several laboratory colleagues warned Shuying that Anna was looking for her. During those conversations, the colleagues

recounted statements Anna had previously made concerning her authority over students' employment opportunities and immigration-related status.

144. According to those colleagues, Anna stated: "I am the department chair. I want to be a dictator. And if anyone who doesn't get permission from me before looking for a job, I will send them back to their home country."

145. Upon information and belief, the students who reported Anna's statements were reluctant to report them formally because they feared retaliation and adverse consequences within the lab.

*Delayed Graduation & Subsequent Employment Issues*

146. Anna was removed from Shuying's dissertation committee. She ultimately resigned from her position of department chair. She remained a professor of pharmaceutical sciences in the College of Pharmacy thereafter.

147. Steven was removed as the chair of Shuying's dissertation committee, but he remained on her dissertation committee. He also remained her PI and her advisor. Steven remained a professor of pharmaceutical sciences and professor of biomedical engineering in the Colleges of Pharmacy and Engineering respectively.

148. Following the loss of the Gilead position, Shuying no longer had post-graduation employment. As an international student, Shuying reasonably concluded that graduating in August 2025 without alternative employment would expose her to significant immigration-related uncertainty.

149. Accordingly, Shuying elected to postpone her oral defense until October 2025, which would allow her to maintain F-1 student status until December of 2025. That way she would have more time to find a post-graduation job.

150. In this respect, the graduation delay imposed by Defendants became self-fulfilling: once the Gilead position was lost, the circumstances created by the delay made postponement of graduation the prudent course.

151. Shuying successfully defended her dissertation and ultimately earned her Ph.D. in Pharmaceutical Sciences from the University of Michigan.

152. Thereafter, Shuying transitioned to a temporary immigration status, Optional Practical Training ("OPT"), , which became effective February 27, 2026.

153. Between the expiration of her F-1 student status in December and the commencement of OPT, Shuying was unable to lawfully work despite continuing to incur living expenses, including car & health insurance and rent.

154. On March 2, 2026, Shuying accepted a temporary Research Fellow position at the University of Michigan's Life Sciences Institute while continuing to seek permanent employment in the pharmaceutical industry.

155. Shuying ultimately secured employment with Boehringer Ingelheim, relocated to Brewster, New York, and commenced work on May 11, 2026. By that time, however, she had already lost the Gilead opportunity and experienced months of additional financial, professional, and immigration-related uncertainty.

## LEGAL ALLEGATIONS

### *Count I (University of Michigan)*
### *Violation of the Elliott-Larsen Civil Rights Act – Employment Discrimination*

156. Previous paragraphs adopted by reference.

157. At all relevant times, Plaintiff was an employee and Defendant UM was an employer covered by and within the meaning of the Elliott-Larsen Civil Rights Act ("ELCRA"), MCL § 37.2201 (a).

158. Plaintiff was qualified for her job and performed commendably.

159. Plaintiff is of Chinese national origin and is a member of a protected class under ELCRA.

160. Defendant UM subjected Plaintiff to adverse employment treatment by, selectively extending her employment, denying her the flexibility afforded to similarly situated domestic students, and interfering with her transition to post-graduate employment, and denying her the same flexibility afforded to domestic (non-international) students, and as otherwise described above and herein.

161. Similarly situated domestic students were permitted to terminate employment without satisfying the publication requirements and other conditions imposed upon Plaintiff.

162. Defendant UM treated Plaintiff differently than similarly situated domestic students because of, and on the basis of, her national origin.

163. Prior to the rescission of Plaintiff's employment offer, University officials were informed that Plaintiff disputed the basis for the graduation delay, that similarly situated domestic students had received more favorable treatment, and that the delay threatened Plaintiff's employment opportunity with Gilead.

164. Despite that knowledge and despite the time-sensitive nature of Plaintiff's employment opportunity, Defendant UM permitted the graduation delay and related academic decisions to remain in effect.

165. As a direct and proximate result of Defendants' national origin discrimination, Plaintiff has suffered damages stated herein and below.

166. Defendant UM's intentional discriminatory actions were motivated by Plaintiff's national origin.

***Count II (Steven and Anna Schwendeman)***
***Violation of the Elliott-Larsen Civil Rights Act – Employment Discrimination***

167. Previous paragraphs adopted by reference.

168. At all relevant times, Plaintiff was an employee and the Defendants Schwendeman were employers covered by and within the meaning of ELCRA, as they were agents of the employer University of Michigan. [MCL 37.2201 (a)]

169. Plaintiff was qualified for her job and performed commendably.

170. Plaintiff is of Chinese national origin and is a member of a protected class under ELCRA.

171. The Schwendemans subjected Plaintiff to adverse employment treatment by, selectively extending her employment, denying her the flexibility afforded to similarly situated domestic students, and interfering with her transition to post-graduate employment, and denying her the same flexibility afforded to domestic students.

172. Similarly situated domestic students were able to terminate employment without satisfying the publication requirements and other conditions imposed upon Plaintiff.

173. The Schwendemans treated Plaintiff differently than similarly situated domestic students because of, and on the basis of, her national origin.

174. Defendants Schwendimans' intentional discriminatory actions were motivated by Plaintiff's national origin.

175. The adverse actions taken by the Defendants Schwendeman were because of Plaintiff's national origin.

176. The discrimination by the Defendants Schwendeman have damaged Plaintiff as described herein and below.

***Count III (University of Michigan)***
***Violation of the Elliott-Larsen Civil Rights Act – Education Discrimination***

177. Previous paragraphs adopted by reference.

178. Defendant UM was, at all relevant times, an educational institution within the meaning of ELCRA, MCL § 37.2401, which states in relevant part:

> An educational institution shall not do any of the following:
>
> (a) Discriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of … national origin ….
>
> (b) Exclude, expel, limit, or otherwise discriminate against an individual seeking admission as a student or an individual enrolled as a student in the terms, conditions, or privileges of the institution, because of …national origin …

179. Defendant UM subjected Plaintiff to adverse educational treatment by delaying her graduation, selectively enforcing publication and graduation requirements, denying her the flexibility afforded to similarly situated domestic students, and interfering with her transition to post-graduate employment, denying her the same flexibility afforded to domestic students, and as otherwise set forth more fully above.

180. Similarly situated domestic students were permitted to graduate without satisfying the publication requirements and other conditions imposed upon Plaintiff.

181. Defendants treated Plaintiff differently than similarly situated domestic students because of, and on the basis of, her national origin.

182. Prior to the rescission of Plaintiff's employment offer, University officials were informed that Plaintiff disputed the basis for the graduation delay, that similarly situated domestic students had received more favorable treatment, and that the delay threatened Plaintiff's employment opportunity with Gilead.

183. Despite that knowledge and despite the time-sensitive nature of Plaintiff's employment opportunity, Defendants permitted the graduation delay and related academic decisions to remain in effect.

184. As a direct and proximate result of Defendants' national origin discrimination, Plaintiff has suffered damages stated herein and below.

### *Count IV (Defendants Schwendeman)*
### *Violation of the Elliott-Larsen Civil Rights Act – Education Discrimination*

185. Previous paragraph adopted by reference.

186. The Defendants Schwendeman were, at all relevant times, agents of an educational institution within the meaning of ELCRA, MCL § 37.2401, which "includes the agent of an educational institution."

187. At all relevant times, these defendants acted as agents, employees, faculty members, advisors, dissertation committee members, and academic decisionmakers for the University of Michigan with authority over Plaintiff's academic progress, publication requirements, dissertation committee process, graduation eligibility, and degree completion.

188. Plaintiff is of Chinese national origin and is a member of a protected class under ELCRA.

189. Defendants Anna and Steven subjected Plaintiff to adverse educational treatment by delaying her graduation, selectively enforcing publication and

graduation requirements, denying her the flexibility afforded to similarly situated domestic students, and interfering with her transition to post-graduate employment, and denying her the same flexibility afforded to domestic students.

190. Similarly situated domestic students were permitted to graduate without satisfying the publication requirements and other conditions imposed upon Plaintiff.

191. Defendants Anna and Steven treated Plaintiff differently than similarly situated domestic students because of, and on the basis of, her national origin.

192. As a direct and proximate result of Defendants' national origin discrimination, Plaintiff has suffered damages stated herein and below.

***Count V***
***(Against Defendants Schwendeman, in their individual capacities)***
***Intentional Interference with Business Expectancy/Contractual Relations***

193. Previous paragraphs adopted by reference.

194. At all relevant times, Plaintiff had a valid business expectancy in her employment relationship with Gilead Sciences, Inc.

195. Plaintiff received and accepted an offer of employment from Gilead on or about April 30, 2025.

196. Defendants Steven and Anna knew of Plaintiff's employment offer and anticipated employment with Gilead.

197. Prior to learning of the Gilead offer, Defendants Steven and Anna had not opposed Plaintiff's proposed August 2025 graduation date.

198. Prior to learning of the Gilead offer, Plaintiff had satisfied the graduation requirements set forth in the Pharmaceutical Sciences Handbook, including submission of a draft of her second manuscript.

199. After learning of Plaintiff's acceptance of the Gilead position, Defendants Steven and Anna intentionally interfered with Plaintiff's business expectancy by delaying graduation, imposing new graduation requirements not in the handbook, threatening funding and immigration consequences, and refusing to meet with Plaintiff to discuss graduation requirements.

200. Defendant Anna contacted Gilead personnel on behalf of herself and Steven regarding Plaintiff's employment, without Plaintiff's knowledge or consent.

201. Defendant Steven would benefit from Gilead rescinding the offer to Plaintiff, because Plaintiff would then stay in Defendant Steven's lab for longer.

202. Defendants Steven and Anna's actions were improper, unjustified, malicious, in bad faith, not within the scope of their authority, and undertaken with knowledge that such conduct would jeopardize the Plaintiff's employment opportunity with Gilead.

203. As a direct and proximate result of Defendants' conduct, Gilead rescinded Plaintiff's offer of employment.

204. Defendants' intentional interference with business expectancy has damaged Plaintiff as stated herein and below.

***Count VI (Defendants Schwendeman, in their individual capacities)***
***42 U.S.C § 1983 – Violation of the Equal Protection Clause***

205. Previous paragraphs adopted by reference.

206. Defendant University of Michigan is a public institution organized under the laws of the State of Michigan.

207. At all relevant times, Defendants Anna and Steven acted under color of state law in their capacities as University of Michigan faculty members, dissertation committee members, advisors, and academic decisionmakers.

208. Plaintiff is a citizen of the People's Republic of China and a person of Chinese national origin.

209. The Equal Protection Clause of the Fourteenth Amendment protects against discrimination on the basis of national origin.

210. Plaintiff was similarly situated to other doctoral students in Steven's laboratory with respect to academic standing, degree progress, publication requirements, and graduation eligibility, except for her different national origin.

211. Defendants Anna and Steven intentionally subjected Plaintiff to different standards and requirements than those applied to similarly situated domestic students.

212. Defendants Anna and Steven delayed Plaintiff's graduation while permitting similarly situated domestic students to graduate without satisfying the requirements imposed upon Plaintiff.

213. Defendants' actions were improperly motivated, at least in part, by Plaintiff's national origin.

214. Despite Plaintiff's allegations of disparate treatment and the time-sensitive nature of her employment opportunity, Defendants Anna and Steven permitted the graduation delay and related academic decisions to remain in effect.

215. Defendants Anna and Steven intentionally deprived Plaintiff of the equal protection of the laws secured by the Fourteenth Amendment to the United States Constitution.

216. The intentional and discriminatory conduct of the Defendants Schwendeman was wholly without legal justification, and as such, a reasonable public official should have known they were acting in violation of the U.S. Constitution.

217. As a direct and proximate result of Defendants' deprivation of equal protection, Plaintiff has suffered damages stated herein and below.

***Count VII (Against Defendants Schwendeman, in their individual capacities)***
***42 U.S.C § 1983 – Deprivation of Procedural Due Process***

218. Previous paragraphs adopted by reference.

219. At all relevant times, Defendants acted under color of state law.

220. Defendant University of Michigan is a public institution organized under the laws of the State of Michigan.

221. Plaintiff possessed constitutionally protected interests arising from her continued enrollment as a doctoral candidate in good standing and her entitlement to have academic decisions affecting degree completion made pursuant to the University's published policies, procedures, and graduation requirements.

222. The Handbook established doctoral program requirements and the criteria for graduation, including the publication requirements applicable to doctoral students.

223. Plaintiff satisfied the requirements set forth in the Handbook or, alternatively, satisfied the conditions under which the publication requirement could be waived.

224. Defendants Anna and Steven delayed Plaintiff’s graduation by imposing requirements that were not uniformly applied to similarly situated students and by refusing to meaningfully consider a waiver available under the Handbook.

225. Defendants Steven and Anna failed to provide Plaintiff with adequate notice of any additional graduation requirements, objective standards governing the decision to delay her graduation, or a meaningful opportunity to challenge the decision before suffering the loss of her employment opportunity with Gilead.

226. The Schwendemans deprived Plaintiff of the graduation she had earned without providing any due process or remedial option whatsoever.

227. Defendants' actions were arbitrary, capricious, and inconsistent with the University's published policies and practices.

228. The foregoing conduct deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

229. The intentional and discriminatory conduct of the Defendants Schwendeman was wholly without legal justification, and as such, a reasonable public official should have known they were acting in violation of the U.S. Constitution.

230. As a direct and proximate result of Defendants' deprivation of procedural due process, Plaintiff has suffered damages stated herein and below.

***Count VIII (Defendants Schwendeman, in their individual capacities)***
***18 USC §§ 1589 and 1595 – Trafficking Victims Protection Reauthorization Act***

231. Previous paragraphs adopted by reference.

232. Plaintiff was an international doctoral student whose ability to remain and work in the United States depended substantially upon her academic status, graduation, and subsequent employment.

233. Defendants Anna and Steven were aware of Plaintiff's immigration status and the importance of graduation and employment to her ability to remain lawfully in the United States.

234. These Defendants used, or attempted to use, Plaintiff's immigration-related vulnerability to induce Plaintiff to continue providing research and academic services within Steven's laboratory, which was a benefit to the Schwendemans.

235. These Defendants repeatedly referenced immigration consequences, green card opportunities, and Plaintiff's ability to remain in the United States while discouraging Plaintiff from leaving the laboratory for outside employment.

236. Defendants Anna and Steven knew or should have known that these statements and threats were improper.

237. These defendants nonetheless used these statements and threats in order to provide a benefit to them, to continue having Plaintiff provide labor to Steven's lab.

238. Defendants delayed Plaintiff's graduation after Plaintiff secured outside employment and thereby impaired Plaintiff's ability to transition to alternative employment and immigration sponsorship.

239. Defendants' conduct constituted, or alternatively attempted to constitute, the obtaining of labor or services through threats of serious harm and abuse or threatened abuse of legal process within the meaning of the TVPA.

240. Defendants Steven and Anna's actions were improper, unjustified, malicious, in bad faith, not within the scope of their authority, and undertaken with knowledge that such conduct would jeopardize the Plaintiff's employment opportunity with Gilead and induce her to remain financially dependent on the Schwendemans and remain in their employ at the lab.

241. As a direct and proximate result of Defendants' conduct, Plaintiff suffered economic and non-economic damages.

242. Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages, attorney fees, costs, and all other relief authorized by law.

## DAMAGES

243. Previous paragraphs adopted by reference.

244. As a direct and proximate result of Defendants' conduct, Plaintiff suffered substantial economic and non-economic damages.

245. Plaintiff lost the Gilead employment opportunity she had secured prior to Defendants' decision to delay her graduation.

246. Plaintiff lost the salary, benefits, bonuses, retirement contributions, stock compensation, career advancement opportunities, and other compensation associated with the Gilead position.

247. Plaintiff's entry into the private pharmaceutical industry was delayed by approximately one year.

248. Plaintiff was deprived of the opportunity to begin building seniority, experience, professional relationships, and advancement opportunities within the pharmaceutical industry at the time she reasonably anticipated.

249. Although Plaintiff ultimately earned her Ph.D. in Pharmaceutical Sciences from the University of Michigan, the loss of the Gilead position materially altered her anticipated educational, professional, and immigration trajectory.

250. Following graduation, Plaintiff remained in temporary immigration status and was required to transition from F-1 student status to Optional Practical Training authorization.

251. Plaintiff incurred a period during which she was unable to lawfully work while awaiting the commencement of her OPT authorization.

252. During that period, Plaintiff continued to incur ordinary living expenses, including housing, transportation, insurance, food, and other necessities, despite having no employment income.

253. Plaintiff's driver's license and other privileges associated with her prior immigration status were affected by the transition process, creating additional inconvenience, uncertainty, and expense.

254. The loss of the Gilead position also affected Plaintiff's ability to pursue H-1B sponsorship. Had Plaintiff commenced employment with Gilead as

anticipated, she would have been positioned to participate in the yearly March H-1B lottery cycle through a private-sector employer.

255. Instead, because the Gilead position was lost and Plaintiff did not begin permanent private-sector employment until May 11, 2026, Plaintiff missed the first H-1B lottery cycle she otherwise would have been positioned to enter.

256. This is significant as changes to immigration policies bring much more uncertainty regarding continued H-1B sponsorship through Shuying's current employer. If Shuying had been able to accept and retain the Gilead position, she would have been eligible to enter the H-1B lottery before the proposed change.

257. Because OPT and STEM OPT immigration statuses provide only a limited period of employment authorization (36 months), missing that lottery cycle reduced Plaintiff's practical opportunities to obtain H-1B status during her available OPT/STEM OPT period from approximately three opportunities to approximately two, one in 2027 and one in 2028.

258. Plaintiff therefore lost not merely a job offer, but one of a limited number of time-sensitive opportunities to transition from temporary student-based work authorization to longer-term employment-based immigration status.

259. Plaintiff suffered emotional distress, anxiety, humiliation, frustration, embarrassment, loss of professional standing, and mental anguish as a result of Defendants' conduct.

260. Plaintiff has suffered additional consequential damages, the full extent of which will be established through discovery and proven at trial.

261. Plaintiff is entitled to recover all economic damages, non-economic damages, consequential damages, statutory damages, attorney fees where authorized by law, costs, interest, and such other relief as the Court deems just and appropriate.

## RELIEF REQUESTED

***W H E R E F O R E,*** Plaintiff Shuying Wang requests this honorable court grant her the following as permitted by law and equity:

a. compensatory damages;

b. punitive damages;

c. liquidated damages;

e. compensable costs, interest, and reasonable attorney fees;

f. other relief as permitted by law.

Respectfully submitted,
Attorneys for Plaintiff Shuying Wang

**ROUMEL LAW**

/s/ Nicholas Roumel

September 14, 2026

Nicholas Roumel, Attorney